UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| TONYA ARTIS, *et al*, § | |
| § | |
| Plaintiffs, § | |
| VS. § | CIVIL ACTION NO. G-10-323 |
| § | |
| WILLIE LEE ASBERRY, JR.; dba § | |
| A&A TRANSPORTATION, *et al*, § | |
| § | |
| Defendants. § | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Tonya Artis, Quinta Okuwa, Michael Wooten, and Donna King, who worked as drivers providing nonemergency medical transportation services, filed this putative collective action alleging violations of the Fair Labor Standards Act ("FLSA"). Plaintiffs sued two different categories of parties: (1) the "AMR Defendants"[1] who contract with state agencies to transport patients enrolled in Medicare and Medicaid to medical appointments and subcontract with various transportation providers "who actually provide the medical transportation[] services"; and (2) the "Subcontractor Defendants,"[2] certain of those transportation

---

[1] The AMR Defendants are American Medical Response, Inc. ("AMR, Inc."); American Medical Response of Texas, Inc. ("AMR Texas"); and Emergency Medical Services Corporation ("EMSC"). Docket Entry No. 78 ¶¶ 21–23. American Medical Response Ambulance Service, Inc. was also named as a Defendant in the Second Amended Complaint, but subsequently dismissed at Plaintiffs' request. *See* Docket Entry No. 82.

[2] The Subcontractor Defendants are Willie Lee Asberry, Jr., individually and d/b/a A&A Transportation; Stephanie D. Asberry, individually and d/b/a A&A Transportation; HALO Transport, Inc.; Abraham Tolbert; Shelia Tolbert; La Mode Concierge Limited Liability

providers who employed Plaintiffs.  Docket Entry No. 78 ¶ 25.  Plaintiffs allege that the Subcontractor Defendants and the AMR Defendants were "joint employers" under the FLSA and are therefore jointly and severally liable for Plaintiffs' injuries.

The AMR Defendants now move for summary judgment arguing, among other grounds, that the AMR Defendants are not joint employers liable for any FLSA violations.  With the aid of the parties' briefing, substantial summary judgment evidence, and well-developed case law, the Court has conducted a thorough examination of the relationship between Plaintiffs and the AMR Defendants and determines that the AMR Defendants were not joint employers under the FLSA.  Accordingly, the AMR Defendants' Motion for Summary Judgment is **GRANTED**.

## I.  BACKGROUND

On June 1, 2006, the Texas Department of Transportation ("TxDOT") awarded AMR Texas a contract to provide medical transportation services to Texas residents participating in Medicare and Medicaid.[3]  Both parties agree that

---

Company; Novus Tax Service Limited Liability Company; Novus Financial Outreach, Inc.; Heleace Nicole Wiley a/k/a Healeace Nicole Beasley d/b/a La Mode Concierge; and Defendant Tracy Lavan Beasley.  Docket Entry No. 78 ¶¶ 10–19.

[3] Although Plaintiffs state that the AMR Defendants were awarded the contract, Docket Entry No. 102 at 4, the evidence shows that AMR Texas contracted with TxDOT.  *See* Docket Entry Nos. 103-1 (Blanket Master Purchase Order between TxDOT and AMR Texas); 102-2 (letter from Texas Health and Human Services Commission to AMR Texas discussing "your contract

TxDOT's October 2005 Request for Proposal ("RFP"), Docket Entry No. 103, defines the terms of the contract.[4]

Notably, the RFP states that the "Transportation Service Area Provider(s) (TSAP's) [sic] shall enter into subcontract agreements with a variety of public and private transportation service providers to ensure transportation service availability to all eligible recipients in each of the 24 established service areas covering all of the 254 counties in Texas." Docket Entry No. 103 at AMR000236. The RFP implicitly governs many aspects of the subcontracting relationships by requiring, among other things, that the Transportation Service Area Provider:

- ensure that all subcontractors adhere to all applicable federal, state and local laws and standards regarding transportation services, *id.* at AMR000237;

- have hiring and screening procedures in place to ensure that drivers meet all applicable vehicle safety requirements, *id.* at AMR000243;

- implement and maintain a drug and alcohol testing program for drivers in compliance with 49 C.F.R. §§ 40, 655, *id.*;

- ensure that drivers do not use tobacco products while performing their duties, *id.*;

- ensure that drivers have a valid driver's license, *id.*;

---

with [TxDOT]"). The evidence also shows that AMR, Inc., as opposed to the AMR Defendants generally, was the "Transportation Service Area Provider" as discussed below. *See* Docket Entry Nos. 97-1–3 ¶ 1.1 (contracts between AMR, Inc. and various Subcontractor Defendants); 107-8 ¶ 8 (affidavit testimony from AMR, Inc.'s Operations Director attesting that AMR, Inc. is the Transportation Service Area Provider).

[4] TxDOT's responsibilities under the contract were transferred to the Texas Health and Human Services Commission on May 1, 2008. Docket Entry No. 102-2.

- maintain records of drivers' criminal history and driving citations, *id.* at AMR000244;

- ensure that drivers interact in a professional manner and provide necessary assistance to patients entering and exiting the vehicle, *id.*;

- ensure that all vehicles comply with the Americans with Disabilities Act, 36 C.F.R. § 38, and other pertinent regulations, *id.* at AMR000245;

- implement an annual safety inspection process to verify that all vehicles meet applicable federal, state, and local ordinances, *id.* at AMR000246; and

- provide training for drivers, *id.* at AMR000253.

Section 14 of the RFP further defines the contours of the subcontracting relationship. *Id.* at AMR000255. Among other things, that section states that: subcontractors must meet the same requirements as the Transportation Service Area Provider; a subcontract does not relieve the Transportation Service Area Provider of its responsibilities; the Transportation Service Area Provider "assume[s] responsibility for coordination, control, and performance of all subcontractors"; and TxDOT may request the removal of any subcontractor deemed unsatisfactory. *Id.*

Pursuant to the RFP, AMR, Inc., as the Transportation Service Area Provider, subcontracted with transportation providers, including the Subcontractor Defendants. For instance, AMR, Inc. subcontracted with Defendants La Mode Concierge, LLC in October 2006; A & A Transportation in December 2006; and HALO Transport, Inc. in September 2007. The three subcontracts submitted to the

Court are substantially similar and employ much of the same form language. *See* Docket Entry Nos. 97-1–3. The subcontracts set up the general service relationship, in which eligible patients call TxDOT with trip requests, TxDOT sends the trips to AMR, Inc., and AMR, Inc. schedules authorized trips with the subcontractors who physically perform the services. *Id.* ¶ 5.7. Germane to the instant motion, each subcontract contains a provision stating that "[n]either the Sub-Contractor nor its employees, agents or officers are employees or agents of AMR for any purpose." *Id.* ¶ 3.6. The subcontracts incorporate the terms and conditions of the RFP, *id.* ¶ 3.1, and their substance is largely derived from the RFP. For example, the requirements for insurance coverage, drivers, training, and vehicles track, or at least meet, those in the RFP. *Compare id.* ¶¶ 4.2, 5.11–15 *with* Docket Entry No. 103 ¶¶ 10.9, 10.4–5.

Contrary to Plaintiffs' assertions, the AMR Defendants did not "retain the ability to hire, fire and discipline the subcontractors' employees." Docket Entry No. 102 at 6. The subcontracts explicitly state that the subcontractors are responsible for "employment of personnel [and] supervision of operators." Docket Entry Nos. 97-1–3 ¶ 5.8(i). The subcontracts required the subcontractors to remove a driver from service under the contract if they received more than two customer complaints regarding that driver's courteousness, and authorized AMR, Inc. to require the subcontractors to discipline or remove from service a driver who

AMR, Inc. or TxDOT reasonably believed was not providing service in a "safe, reliable, and responsive manner." *Id.* ¶ 5.12. However, AMR, Inc. was not empowered to control drivers' employment outside the scope of the subcontract arrangement. *See id.*; *see also* Docket Entry No. 107-8 ¶ 27 ("In the event that a Subcontractor Defendant's employee is no longer able to provide services pursuant to the AMR, Inc. contract with the Subcontractor Defendant, AMR, Inc. does not in any way control, or attempt to preclude a Subcontractor Defendant from using its employee for any other non-contract AMR, Inc. service."). And Plaintiffs present no evidence that the subcontractors' business was primarily confined to AMR, Inc.—or that the AMR Defendants restricted the subcontractors' ability to conduct business with others—to suggest that being removed from service under the AMR, Inc. contract would effectively render a driver terminated from employment with his or her subcontractor employee.

The crux of Plaintiffs' lawsuit is that they and other similarly situated drivers were "compensated at their regular rate and/or at a piece rate that [did] not take into consideration the number of hours actually worked and/or [were] required to work 'off the clock.'" Docket Entry No. 78 ¶ 33. Plaintiffs point out that the AMR Defendants were required to abide by "minimum and maximum salary and wage statutes and regulations." Docket Entry No. 103 at AMR000306. However, the AMR Defendants did not directly control the amount or structure of the

Plaintiffs' or any other driver's compensation. Rather, AMR, Inc. "reimbursed" the subcontractors at flat rates per trip, and the subcontractors then compensated their employees. *See* Docket Entry No. 97-1–3, Compensation Attachments. For instance, AMR, Inc. reimbursed HALO Transport, Inc. $16.00 for one way trips within the recipient's county of residence and $28.80 for one way trips outside the recipient's county of residence. *See* Docket Entry 97-2 at AMR000392, 404. The Plaintiffs assert they were paid "a fixed sum for each signature they received," but do not present evidence detailing the amount of that sum or how that sum is derived. Docket Entry No. 78 ¶ 51.

## II. SUMMARY JUDGMENT STANDARD

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment. *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

### III.  DISCUSSION

#### A.  "Joint Employment" under the FLSA

To establish a prima facie case under the FLSA, an employee has the burden of proving the existence of an employer–employee relationship by a preponderance of the evidence.  *Prince v. MND Hospitality, Inc.*, No. H-08-2617, 2009 WL 2170042, at *5 (S.D. Tex. July 20, 2009).  Whether a person is an employer under the FLSA is a question of law, although "subsidiary findings are of fact."  *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 (5th Cir. 1985); *see also Solis v. Universal Project Mgmt., Inc.*, No. H-08-1517, 2009 WL 4043362, at *2 n.3 (S.D. Tex. Nov. 19, 2009) (discussing confusion over this standard in prior cases).

The FLSA defines an "employer" in part, as "any person acting directly or indirectly in the interest of an employer."  29 U.S.C. § 203(d).  An entity's status as an employer for the purpose of the FLSA turns on the "economic reality" of the working relationship.  *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961) (citations omitted).  "The Fifth Circuit has held that the FLSA's definition of 'employer' is 'sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees.'"  *Iztep v. Target Corp.*, 543 F. Supp. 2d 646,

652 (W.D. Tex. 2008) (citing *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 329 (5th Cir. 1993)).

The FLSA recognizes the possibility of multiple employers. 29 C.F.R. § 791.2(a); *Cooke v. Jasper*, No. H-07-3921, 2010 WL 4312890, at *4 (S.D. Tex. Oct. 25, 2010). The Department of Labor regulations contemplate "joint employment" in situations where: (1) "there is an arrangement between the employers to share the employee's services"; (2) "one employer is acting directly or indirectly in the interest of the other employer . . . in relation to the employee"; or (3) the employers "may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer." 29 C.F.R. § 791.2(b). The determination of joint employment depends on "all the facts in the particular case." *Id.* § 791.2(a).

The general "economic reality" test for determining who qualifies as an FLSA employer "includes inquiries into: whether the alleged employer (1) has the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)); *see also Gray v. Powers*, 673 F.3d 352, 355–57 (5th Cir. 2012)

(applying same test). In the context of a joint-employment claim, the Fifth Circuit has also applied a five-factor test, which considers "the total employment situation" with particular regard to the following questions:

> (1) Whether or not the employment takes place on the premises of the company?; (2) How much control does the company exert over the employees?; (3) Does the company have the power to fire, hire, or modify the employment condition of the employees?; (4) Do the employees perform a 'specialty job' within the production line?; and (5) May the employee refuse to work for the company or work for others?

*Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669–70 (5th Cir. 1968).[5] "No one factor is determinative of whether a defendant is an 'employer' under the FLSA." *Iztep*, 543 F. Supp. 2d at 653. The Court "need not decide that *every* factor weighs against joint employment" in order to grant summary judgment; it must merely conclude that insufficient evidence exists in the record to establish employment when the facts are interpreted in the light most favorable to plaintiffs. *Zheng v.*

---

[5] Other Circuits have applied different, yet similar, tests. The Second Circuit, for example, has applied a six-factor test considering: (1) whether the entity's premises and equipment were used for plaintiffs' work; (2) whether the labor contractor had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to the entity's process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the entity or its agents supervised plaintiffs' work; and (6) whether plaintiffs worked predominantly for the entity. *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)). The Eleventh Circuit has applied an eight-factor test considering: (1) the nature and degree of control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the power to determine the pay rates or the methods of payment of the workers; (4) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; (5) preparation of payroll and the payment of wages; (6) ownership of the facilities where work occurred; (7) performance of a specialty job integral to the business; and (8) investment in equipment and facilities. *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1176–77 (11th Cir. 2012) (citations omitted).

*Liberty Apparel Co.*, 355 F.3d 61, 76–77 (2d Cir. 2003) (emphasis in original).

## B.  Application of the Factors

Using these factors from the overlapping *Watson* and *Lone Star* tests as a guide, the Court turns to examining the employment relationship between the AMR Defendants and Plaintiffs.

First, as described in detail above, the AMR Defendants did not have "the power to hire and fire the employees." *Watson*, 909 F.2d at 1553.  The Subcontractor Defendants were independently responsible for "employment of personnel" under the subcontracting arrangements.  Docket Entry Nos. 97-1–3 ¶ 5.8(i).  AMR, Inc. was not authorized to directly add or remove the Subcontractor Defendants' drivers from service under the contracts, nor could it control drivers' employment with the Subcontract Defendants outside the scope of the service arrangements.  *Id.* ¶ 5.12; Docket Entry No. 107-8 ¶ 27.  Such facts demonstrate that the parties were engaged in no more than "a standard independent subcontracting arrangement—a relationship that the law resists deeming as a dual employment situation."  *Mendez v. Timberwood Carpentry & Restoration, LLC*, No. H-09-490, 2009 WL 4825220, at *6 (S.D. Tex. Dec. 9, 2009) (citing *Zheng*, 355 F.3d at 74 n.11).

Second, the AMR Defendants' degree of "supervision" or "control" over Plaintiffs—a factor present in both the *Watson* and *Lone Star* tests—was "perfectly

consistent with a typical, legitimate subcontracting arrangement," as opposed to one of joint employment. *Zheng*, 355 F.3d at 75. As Plaintiffs point out at length, AMR, Inc. no doubt had extensive guidelines over many aspects of the drivers' employment. AMR, Inc.'s "Driver Protocols" instruct, among other things, that drivers wear identification, refrain from playing loud or offensive music, and ensure that passengers wear seatbelts. Docket Entry No. 103-5. Additionally, as detailed above, the subcontracts require the drivers to obtain training, meet standards, and abide by rules ranging from being courteous to not smoking around clients to picking up customers on time. *See, e.g.*, Docket Entry No. 97-1 ¶¶ 5.11–5.12.

But supervision and control should not be "misinterpreted to encompass run-of-the-mill subcontracting relationships"; Supreme Court precedent indicates that "such extensive supervision weighs in favor of joint employment only if it demonstrates effective control of the terms and conditions of the plaintiff's employment." *Zheng*, 355 F.3d at 74–75 (citing *Rutherford*, 331 U.S. at 726). Mere supervision with respect to contractual warranties of quality and time of delivery, such as the protocols listed above, are insufficient to support joint employment. *See Mendez*, 2009 WL 4825220, at *6 (quoting *Zheng*, 355 F.3d at 75).

The Court agrees with the AMR Defendants that the present facts more

closely resemble those in *DHL Express*, 686 F.3d at 1173, in which the Eleventh Circuit found that DHL was not an employer of its contractor's drivers, than *Rutherford*, 331 U.S. at 730, in which the Supreme Court found that a slaughterhouse jointly employed "meat boners" who were directly controlled by an independent supervisor. Like DHL, the AMR Defendants dictated pick-up times to the subcontractors and set certain objectives for the drivers. *DHL Express*, 686, F.3d at 1178. But also like DHL, the AMR Defendants "did not involve itself with the specifics of how those goals would be reached—[they] did not apportion tasks to individuals, specify how many individuals should be assigned to each delivery route, or structure the chain of command among Drivers." *Id.*; *see also* Docket Entry No. 107-8 ¶ 34. AMR, Inc. did not take a hands-on approach like the slaughterhouse manager in *Rutherford*, who went "through the boning vestibule many times a day and '[was] after the boners frequently about their failure to cut all of the meat off the bones.'" 331 U.S. at 726. Rather, the Plaintiff-drivers spent the majority of their days by themselves in their vehicles, away from the AMR Defendants' facilities and employees. *See DHL Express*, 686 F.3d at 1179. And the agreements make clear that the subcontractors are "responsible for all aspects of day-to-day operations of the service, including . . . supervision of operators." Docket Entry Nos. 97-1–3 ¶ 5.8(i). Overall, this factor weighs against a finding of joint employment.

Third, the AMR Defendants did not "determine[] the rate and method of payment" for Plaintiffs. *Watson*, 909 F.2d at 1553. While AMR, Inc. and the subcontractors agreed to flat rates for reimbursement, the subcontractors independently dealt with their payment obligations to its drivers. *See Mendez*, 2009 WL 4825220, at *6; *DHL Express*, 686 F.3d at 1179. Nothing in the record indicates that AMR, Inc. was even aware of how much Plaintiffs were being paid or how that pay was calculated. Accordingly, this factor weighs against a finding of joint employment.

Fourth, the Court finds that AMR, Inc. did "maintain[] employment records" for the Plaintiffs and other similarly situated drivers. *Watson*, 909 F.2d at 1553. Plaintiffs present evidence that AMR, Inc. provided the Subcontractor Defendants and their employees with call logs and driver manifests to be filled out by the employees. Docket Entry Nos. 103-6–7. But Plaintiffs present no evidence that these documents were returned to AMR, Inc. or that AMR, Inc. maintained any personnel files for the employees, which suggests that these documents were aimed more at managing customers' appointments than managing employees. Moreover, none of these were payroll records, which would present a much stronger case for joint employment under the FLSA. *Cf. Iztep*, 543 F. Supp. 2d at 654 (finding employment relationship where company, among other things, maintained plaintiffs' payroll records). Thus, the Court questions how much these records

bear on the economic realities of Plaintiffs' employment. Nonetheless, when viewed in a light most favorable to Plaintiffs, this factor weighs in favor of joint employment.

Fifth, Plaintiffs' employment did not "take place on the premises of" AMR, Inc., nor did Plaintiffs use AMR, Inc.'s equipment. *See Lone Star*, 405 F.2d at 669–70. This factor "is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work." *Zheng*, 355 F.3d at 72. It is undisputed that Plaintiffs did not work on the AMR Defendants' premises and that the subcontractors own— and the AMR Defendants do not provide—the vehicles used to transport clients. *See* Docket Entry No. 107-8 ¶ 15. As such, Plaintiffs have an even weaker case than the delivery drivers in *DHL Express*, who were not able to survive summary judgment regarding joint employment despite the fact that they started and ended their workdays at DHL warehouses, used DHL scanners, and wore DHL uniforms. *DHL Express*, 686 F.3d at 1173–74. Therefore, this factor does not support a finding of joint employment.

Sixth, and finally, Plaintiffs were allowed to "refuse to work for the company or work for others." *Lone Star*, 405 F.2d at 669–70.[6] Plaintiffs present

---

[6] The fourth *Lone Star* factor—whether "the employees perform a 'specialty job' within the production line"—is not relevant to the present facts. *Id.* That factor is derived from *Rutherford*, in which the Supreme Court found that meat boners "did a specialty job on the production line"

no evidence, and the Court is aware of none, stating that they were prohibited from providing transportation services to companies other than the AMR Defendants. Plaintiffs assert that "nearly all of the Subcontractor Defendants' business comes from the AMR Defendants," but present no evidence in support of that statement. Docket Entry No. 102 at 7.  In any event, courts within this District have held that even a nonsolicitation provision is insufficient to support "employer" status with regard to a subcontracting arrangement.  *See Mendez*, 2009 WL 4825220, at *7. Overall, this factor weighs against a finding of joint employment.

In sum, the AMR Defendants could not hire or fire Plaintiffs; they did not have an overly active role in Plaintiffs' supervision; they did not determine the rate and method of Plaintiffs' payment; they did not provide Plaintiffs with facilities or equipment; and they did not prohibit Plaintiffs from working for others. Accordingly, based on the applicable law and undisputed facts, the Court determines that the AMR Defendants were not employers of the Plaintiffs within the meaning of the FLSA.[7]

---

at a slaughterhouse and were "part of the integrated unit of production."  331 U.S. at 729–30. Like the Eleventh Circuit in *DHL Express*, this Court agrees that Plaintiffs performed a crucial task for the AMR Defendants, but is "hesitant to say that their role was 'analogous to employees working at a particular position on a larger production line'" given that Plaintiffs' work was performed apart from the AMR Defendants' facilities or supervision.  *DHL Express*, 686 F.3d at 1180 (quoting *Antenor v. D & S Farms*, 88 F.3d 925, 937 (11th Cir. 1996)).

[7] The AMR Defendants argue that summary judgment is warranted for four additional reasons: (1) they argue that AMR Texas and EMSC had no contractual relationship with the Plaintiffs or Subcontractor Defendants; (2) they cite to *Von Friewalde v. Boeing Aerospace Op., Inc.*, 339 F.

## IV. CONCLUSION

The economic realities of Plaintiffs' relationship with AMR Defendants demonstrate that the AMR Defendants were not Plaintiffs' employer as defined by the FLSA. Plaintiffs bear the burden of establishing an employer–employee relationship under the FLSA, and they are unable to do so with respect to the AMR Defendants as a matter of law. Accordingly, the Court **GRANTS** Defendants American Medical Response, Inc., American Medical Response of Texas, Inc., and Emergency Medical Services Corporation's Motion for Summary Judgment (Docket Entry No. 96).

SIGNED this 16th day of October, 2012.

_____
Gregg Costa
United States District Judge

---

App'x 448 (5th Cir. 2009) for support that Plaintiffs' discovery responses fail to raise an issue of material fact to substantiate their claims; (3) they argue that Plaintiffs were not engaged in interstate commerce as required by the FLSA; and (4) in their Reply, they add that claims based on Plaintiffs' former employment with Cavalry Transportation Services, Inc. should be dismissed. Given the holding that even the contractual relationship AMR, Inc. had with subcontractors did not give rise to joint employer status, there is no need to address these additional arguments. With respect to the AMR Defendants' argument seeking summary judgment denying certification of a collective action, the Court notes that the Plaintiffs have the burden to seek court approval for notice to prospective plaintiffs and have not done so, so there is no certification issue to decide at this time.